# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

MARY YINGER, :

          Plaintiff,

  -vs-

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

          Defendant. :

Case No. 3:09-cv-235

District Judge Thomas M. Rose
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g), as incorporated into 42 U.S.C. §1383(c)(3), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to

prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for supplemental security income SSI benefits (SSI), a claimant must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R.

§416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 . If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSI in October, 2004, alleging disability from October 1, 2003, due to numerous physical and mental impairments, including emphysema, congestive heart failure, cardiomyopathy, valvular heart disease, anxiety, depression, hypertension, high cholesterol, and disintegration of a disc in her back. *See* Tr. 66-68; 76. Plaintiff's application was denied initially and on reconsideration. *See* Tr. 40-45. A hearing was held before Administrative Law Judge Melvin Padilla, (Tr. 664-707), who determined that

3

Plaintiff has been disabled since May 3, 2008, but not prior to that date. (Tr. 20-34). The Appeals Council denied Plaintiff's request for review, (Tr. 5-7), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff was not disabled prior to May 3, 2008, Judge Padilla found that she has severe degenerative disc disease in the lumbar spine with residuals of surgery, cardiomyopathy, depression, and anxiety disorder, but that she does not have an impairment or combination of impairments that meets or equals the Listings. *Id.*, ¶ 2, Tr. 24 ¶ 3. Judge Padilla found further that Plaintiff has the residual functional capacity to perform a limited range of light work. (Tr. 25, ¶ 5). Judge Padilla then used section 202.13 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and found that prior to May 3, 2008, there was a significant number of jobs in the economy that Plaintiff was capable of performing. (Tr. 32-33, ¶ 9). Judge Padilla then applied section 202.04 of the Grid and concluded that Plaintiff was disabled as of May 3, 2008, when she attained the age of 55. (Tr. 33, ¶ 10).

The record contains Plaintiff's treatment notes from Schear Family Practice dated April, 1997, through June, 2008. (Tr. 400-96, 631-35, 654-62). Those notes reveal that Plaintiff's physicians, Drs. Schear and Shaw, primarily monitored Plaintiff's blood pressure and prescribed medications. *Id.* Drs. Schear and Shaw also prescribed various psychotropic medications to treat Plaintiff's depression and anxiety. *Id.*

On October 16, 2001, Dr. Shaw reported that Plaintiff's diagnoses were panic disorder, hypertension, low back pain, and hyperlipidemia. (Tr. 166-67). Dr. Shaw also reported that Plaintiff was able to stand/walk and sit each for two hours in an eight-hour day and for one

4

hour without interruption and that she was able to lift up to ten pounds occasionally. *Id.* Dr. Shaw opined that Plaintiff was unemployable. *Id.*

On October 6, 2003, Dr. Shaw, reported that due to her low back pain, hypertension, and severe anxiety disorder, Plaintiff was able to stand/walk and sit each for no more than two hours in an eight-hour workday and for one hour without interruption. (Tr. 164-65). Dr. Shaw also reported that Plaintiff was able to maintain a posture for an hour at a time and was able to lift ten pounds occasionally and five pounds frequently. *Id.* Dr. Shaw again opined that Plaintiff was unemployable. *Id.*

An x-ray of Plaintiff's lumbar spine performed on October 21, 2003, revealed narrowing of the L5-S1 disc space. (Tr. 484). A CT scan of Plaintiff's lumbar spine performed that same day revealed a lobulated-appearing left paracentral and far left lateral disc herniation extending into the left neural exit foramina at L4-L5, and also disc material extending superiorly behind the left aspect of L4. (Tr. 480-81).

Plaintiff consulted with neurosurgeon Dr. Taha on November 12, 2003, who noted that Plaintiff presented with complaints of back and leg pain, walked with a limp, demonstrated weakness in the dorsiflexors, the knee extensor, the hip flexors, and the extensor hallucis longus, and that her sensory exam was normal. (Tr. 217-19). Dr. Taha reported that Plaintiff would need surgery for a herniated disc, but that he wanted to try conservative treatment first. *Id.* On November 26, 2003, after Plaintiff reported worsening symptoms and after discussing conservative care, Dr. Taha recommended surgery. (Tr. 216). Plaintiff underwent a left L4-5 hemilaminectomy and diskectomy, along with a left L3-4 foraminotomy on December 19, 2003. (Tr. 168-84).

On January 6, 2004, Dr. Taha reported that Plaintiff complained of right-sided radiculopathy and that an MRI of Plaintiff's lumbar spine showed right lateral recess stenosis due to a focal disc herniation at L4-5. (Tr. 214). Dr. Taha recommended conservative treatment with anti-inflammatory medications. (Tr. 214).

Plaintiff underwent a redo bilateral L4/5 diskectomy, medial facetectomy, and foraminotomy on March 16, 2004, which Dr. Taha performed. (Tr. 191-210). On March 30, 2004, Plaintiff reported she was doing much better with her leg pain and her back pain was improving. (Tr. 211).

Plaintiff was hospitalized September 4-5, 2004, for treatment of an acute exacerbation of chronic obstructive pulmonary disease. (Tr. 220-25). Plaintiff was treated with medications and discharged with the diagnoses of acute exacerbation of chronic obstructive pulmonary disease, acute bronchitis, addiction to cigarettes, mediastinal adenopathy of uncertain nature, essential hypertension, hyperlipidemia, diastolic cardiomyopathy, anxiety disorder, and glucose intolerance secondary to corticosteroids. *Id.*

Plaintiff was hospitalized September 22-24, 2004, after complaining of right arm numbness, weakness, shortness of breath, slurred speech, and blurry vision. (Tr. 226-65). Plaintiff was treated with medications and discharged with the diagnoses of congestive heart failure, severe mitral valve regurgitation, hypertension, coronary artery disease, hyperlipidemia, arthritis, chronic obstructive pulmonary disease, panic attacks, and depression. *Id.*

In January, 2005, examining psychologist Dr. Flexman noted that Plaintiff reported that she was anxious and depressed, afraid to leave home, and having panic attacks. (Tr. 277-80). Dr. Flexman also noted Plaintiff's facial expressions were within normal limits, her

6

general body movements were restless and fidgety, her speech was appropriate but with a mild press, her affect was expansive, and that her mood was reported as "O.K." *Id.* Dr. Flexman reported that Plaintiff was alert, and that her attention, concentration and reasoning were good. *Id.* Dr. Flexman also reported that Plaintiff was of average intelligence. *Id.* Dr. Flexman identified Plaintiff's diagnoses as pain disorder associated with both general medical condition and psychological factors, depression, and anxiety disorder; he assigned Plaintiff a GAF of 55. *Id.* Dr. Flexman opined that Plaintiff had slight limitations in dealing with others, maintaining concentration and attention, and making-work related decisions. *Id.* Dr. Flexman also opined that Plaintiff was moderately impaired in her ability to work with the public, withstand the stress of normal work pressures, and deal with changes in work environment. *Id.*

On November 2, 2004, Dr. Pacenta, Plaintiff's cardiologist, reported that Plaintiff was doing quite a bit better on her current medications, that her ejection fraction was stable, and that Plaintiff seemed to improve clinically on her current regimen. (Tr. 282). On November 23, 2004, a stress test was negative for ischemia and an EKG showed an ejection fraction of 35% during peak stress. (Tr. 316-17). On January 25, 2005, Dr. Pacenta, reported that Plaintiff's ejection fraction ranged from 30-35% and that he was concerned about Plaintiff's compliance with her medication. (Tr. 281). A June, 2005, an echocardiogram showed Plaintiff's left atrium was "mildly" enlarged, and her ejection fraction was now 40%. (Tr. 503). In December, 2007, Plaintiff was hospitalized for congestive heart failure. (Tr. 555-617). The echocardiogram revealed her ejection fraction was estimated at 25-50%. *Id.*

Dr. Flexman examined Plaintiff again in October, 2005, at which time he noted that Plaintiff reported experiencing panic attacks, feelings of dread, nausea, and anxiety when

7

going out alone, that she had a good relationship with her boyfriend, got along well with others, and that she socialized with family and friends. (Tr. 330-33). Dr. Flexman also noted that Plaintiff reported that she enjoyed going out to eat and dating. *Id.* Dr. Flexman reported that Plaintiff's posture was relaxed, her speech and affect were appropriate, her tone of voice was pleasant with adequate eye contact, and that she was alert and oriented with a good attention span. *Id.* Dr. Flexman identified Plaintiff's diagnoses as pain disorder, panic disorder, and depression; he assigned her a GAF of 55. *Id.* Dr. Flexman reported that Plaintiff was moderately limited in her abilities to deal with the public, interact with coworkers, and deal with stress. *Id.*

Examining physician Dr. Oza reported on November 14, 2005, that Plaintiff's sensory examination was intact, her ankle reflexes were absent, there was some weakness of the great toe extension on the right, and that Plaintiff walked with a limp favoring her right side. (Tr. 334-41). Dr. Orza also reported that Plaintiff's straight leg raising was positive for back pain at thirty degrees on the right and forty-five degrees on the left and that she had a decreased range of motion of her lumbar spine. *Id.* Dr. Oza also reported that Plaintiff had a history of congestive heart failure and, although she had decreased breath sounds, Plaintiff was "well compensated" and that while Plaintiff had a history of COPD, her pulmonary status was stable. *Id.* Dr. Oza noted an x-ray of Plaintiff's spine showed evidence of mild spondylosis and the residuals of surgeries. *Id.* Dr. Oza concluded that Plaintiff's condition was stable, that Plaintiff used a cane without which she felt unstable, that her depression was stable, and that she should change positions every ten to fifteen minutes and should not do any bending, stooping, or lifting. *Id.*

In August, 2006, Plaintiff was seen at Samaritan Behavioral Health Crisis Care for a mental health evaluation. (Tr. 387). At that time, the evaluator noted that Plaintiff reported

a history of depression and anxiety and stated that she was looking to lower her stress so she would not be afraid to go outside the house. *Id.* Plaintiff's diagnoses were identified as major depressive disorder recurrent and unspecified and panic disorder with agoraphobia and she was assigned a GAF of 40. *Id.* Plaintiff was referred to county mental health services. *Id.*

Plaintiff received mental health treatment at South Community from October, 2006, to April, 2008. (Tr. 507-25, 618-30, 636-49). The intake counselor noted that Plaintiff reported that she had symptoms of depression that waxed and waned but never completely went away, had loss of motivation, loss of energy, loss of interest in activities, and that she had feelings of worthlessness, hopelessness, and helplessness. *Id.* The counselor also noted that Plaintiff reported problems with panic attacks and that she rarely left her home for fear of having panic attacks. *Id.* Plaintiff's diagnosis was identified as major depressive disorder recurrent and severe without psychotic features and panic disorder with agoraphobia; the counselor assigned Plaintiff a GAF of 45. *Id.* Plaintiff received counseling from a social worker who, over time, noted modest improvement in her symptoms, raising her GAF to 55. *Id.* Plaintiff saw psychiatrist Dr. Fitz every two to three months for medication adjustments. *Id.*

Plaintiff sought emergency room treatment on October 15, 2007, for complaints of shortness of breath and chest pain for about the past ten days. (Tr. 536-54). The health care providers at the emergency room noted that Plaintiff reported that she did not take her medications regularly and that examination revealed her lungs were clear and her heart was normal. *Id.* Plaintiff was treated and released. *Id.*

Examining psychologist Dr. Kramer noted in April, 2008, that Plaintiff alleged very severe agoraphobia and anxiety, reported that she worried for days if she knew she had to

9

leave her house, that she would not go to her mail box if the neighbors were on their front porch, and that she had not been to the grocery store by herself in ten years. *Id.* Dr. Kramer also noted that Plaintiff had received psychiatric counseling off and on over the past ten or twelve years, and that she had suffered a mini-stroke in the past which affected her memory and concentration. *Id.* Dr. Kramer reported Plaintiff's affect showed very significant anxiety levels, she was shaky and sweating profusely, her mood was somewhat depressed, she was discouraged over social difficulties and social anxiety, she was functioning in the average range of intelligence, and that she was pleasant and cooperative. *Id.* Dr. Kramer also reported that Plaintiff displayed no significant cognitive impairments. *Id.* Dr. Kramer identified Plaintiff's diagnoses as panic disorder with agoraphobia, social phobia, and depressive disorder, NOS, and he assigned her a GAF of 49. *Id.* Dr. Kramer opined that Plaintiff had extreme impairments in her ability to handle work stress and pressure, marked impairments in her ability to relate to others and in her ability maintain attention, persistence, and pace in performing simple tasks, and moderate impairments in her ability to understand, remember and follow instructions. *Id.*

In July 2008, Dr. Schear reported that due to her multiple medical problems which included hypertension, congestive heart failure, arrhythmia, COPD, degenerative disc disease of the lumbar spine and anxiety, Plaintiff is "permanently and totally removed from all gainful employment." (Tr. 663).

At the administrative hearing, the medical adviser (MA) testified that, based on treatment records from South Community and Dr. Kramer's examination, Plaintiff's mental impairment met Listing 12.06 as of 2006. (Tr. 669-70, 678). The MA also testified that Plaintiff's diagnoses were depressive disorder NOS versus a major depressive disorder and a

panic disorder with agoraphobia, that the two evaluations performed by Dr. Flexman in 2005 did not show as severe an impairment as was evident in the treatment record, which began in 2006, which showed an increase in symptoms, and that Plaintiff's symptoms included an inability to go to the grocery store in over ten years, shaking and sweating in Dr. Kramer's presence, nausea, panic attacks at home, inability to go places alone, and avoiding people. (Tr. 679-80).

Plaintiff alleges in her Statement of Errors that the Commissioner erred by failing to even mention the opinion of treating physician Dr. Shaw and by rejecting the testimony of the MA who testified that Plaintiff's mental impairments met Listing 12.06. (Doc. 9).

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009). "One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations."

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,* 20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406*, quoting, Wilson,* 378 F.3d at 544*.* "On the other hand, a Social

11

Security Ruling[1] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 582 F.3d at 406, *citing, Wilson,* 378 F.3d at 544, *citing* 20 C.F.R. § 404.1527(d)(2).

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07,*citing,* Soc.Sec.Rul 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants
> understand the disposition of their cases, particularly in situations
> where a claimant knows that his physician has deemed him
> disabled and therefore might be especially bewildered when told
> by an administrative bureaucracy that she is not, unless some

---

FN 1. Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Blakley,* 581 F.3d at 407*, citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

> The *Wilson* court instructs that where the ALJ fails to give good reasons on the record for according less than controlling weight to treating sources, we reverse and remand unless the error is a harmless *de minimis* procedural violation. *See Wilson.* 378 F.3d at 547. Such harmless error may include the instance where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," or where the Commissioner "has met the goal of ... the procedural safeguard of reasons." *Id.* However, the ALJ's failure to follow the Agency's procedural rule does not qualify as harmless error where we cannot engage in "meaningful review" of the ALJ's decision. *Id.* at 544.

*Blakley,* 581 F.3d at 409.

Treating physician Dr. Shaw opined in October, 2001, and again in October, 2003, that Plaintiff's physical and mental work abilities were severely limited. *See* Tr.164-65, 166-67. Judge Padilla not only failed to describe either of Dr. Shaw's opinions, but he also did not evaluate or weigh Dr. Shaw's opinions under any criteria mandated by the Regulations. *See* Tr. 25-29. This constituted error because the Regulations required Judge Padilla to provide "good reasons" for declining to apply controlling, or any, weight to Dr. Shaw's opinions. *See*

13

*Wilson*, 378 F.3d at 544-45; *see also Bowen*, 478 F.3d at 746-47 (ALJ erred by not addressing treating psychologist's opinions).

The Commissioner contends that this error was harmless because Dr. Shaw's opinion was devoid of any objective findings or treatment notes which would support his opinion. It is highly doubtful that the Commissioner's *post-hoc* rationalizations can be the sole basis to affirm an ALJ's decision when Judge Padilla has failed to weigh a treating medical source opinion as required by the Regulations. "A court cannot excuse the denial of a mandatory procedural requirement protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. '[A] procedural error is not made harmless simply because the [aggrieved party] appears to have had little chance of success on the merits anyway.' To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with §416.927(d)(2), would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory. The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action ... found to be ... without observance of procedure required by law.'" *Wilson*, 378 F.3d at 546 (internal citations omitted). Although the Sixth Circuit has left open the issue of whether a *de minimis* violation of the procedural requirements of §416.927(d)(2) can constitute harmless error, a review of Dr. Shaw's opinions reveals that he provided some explanation in support of his opinions.

In addition, Dr. Shaw's opinions represented Plaintiff's condition before her lumbar surgeries (diskectomy) in December, 2003, and March, 2004. At the time of Dr. Shaw's

offered his 2003, opinion, an x-ray of Plaintiff's lumbar spine showed narrowing of the L5-S1 disc space, (Tr. 484), and a CT scan showed a lobulated-appearing left paracentral and far left lateral disc herniation extending into the left neural exit foramina at L4-L5. (Tr. 480-81). Dr. Shaw opined that because of Plaintiff's panic disorder, hypertension, low back pain and hyperlipidemia, Plaintiff was not able to perform sedentary work, a conclusion with which his colleague, Dr. Schear, agreed. *See* Tr. 663.

In the absence of reasons for rejecting Dr. Shaw's opinions, this Court simply cannot engage in meaningful judicial review of the Commissioner's decision. Of course, in reaching this conclusion, this Court is not suggesting that it would or would not be reasonable for the Commissioner to reject Dr. Shaw's opinions. Rather, the Court concludes that the Commissioner's failure to consider the record as a whole undermines his conclusion that Plaintiff is not disabled. Accordingly, the Commissioner's decision that Plaintiff is not disabled is not supported by substantial evidence on the record as a whole.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to remand the matter for rehearing or to reverse and order benefits granted. The Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. §405(g). If a court determines that substantial evidence does not support the Commissioner's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted); *see also, Newkirk v. Shalala,* 25 F.3d 316 (6th Cir. 1994).

The fourth sentence of 42 U.S.C. Sec. 405(g) directs the entry of a final appealable judgment even though that judgment may be accompanied by a remand order. *Sullivan v. Finkelstein,* 496 U.S. 617 (1990). The fourth sentence does not require the district court to choose between entering final judgment and remanding; to the contrary, it specifically provides that a district court may enter judgment "with or without remanding the cause for rehearing." *Id.*

This Court concludes that not all of the factual issues have been resolved and that the record does not adequately establish Plaintiff's entitlement to benefits. Specifically, the Court notes that there may be adequate bases for the Commissioner to reject Dr. Shaw's opinion that Plaintiff is disabled. However, the Commissioner is required to articulate those reasons in order for the Court to engage in meaningful judicial review. Therefore, the matter should be remanded to the Commissioner for further administrative proceedings. The Court notes that this is a fourth sentence remand. *Finkelstein*, *supra*.

It is therefore recommended that judgment be entered in favor of Plaintiff and against the Commissioner reversing the Commissioner's decision that Plaintiff is not disabled. It is also recommended that this matter be remanded to the Commissioner for additional administrative proceedings.

May 26, 2010.

*s/ Michael R. Merz*
United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).